Bertram Harnett, J.
Is Jones Beach by nature entirely immune from labor picketing? The answer must be “no”; that, under appropriate circumstances, people concerned with work at the beach facility can engage there in peaceful pursuits to bring their work grievances to public attention.
This principle governs the lifeguard work dispute at Jones Beach now before this court. While the principle is easily stated, its application to the facts and circumstances of the case *1072 is not so easy. The matter abounds in what lawyers and Judges delight in characterizing, often to the clients ’ intense discomfort, as ‘ ‘ interesting ” or “ nice ’ ’ points of law. But, more than that, the law here becomes a necessary catalyst in a solution of competing social principles: — the need for peace and privacy in natural setting versus the rights of citizens and workers to be heard in connection with work grievances at the very place the peace and privacy is meant to exist.
I. PARK, PEOPLE AÍTO PARTIES
Jones Beach is a nationally famous beach occupying its own island off the south shore of Long Island. It is connected to the mainland by at least three causeway bridges and arterial highways. The beach preserve itself is actually a gigantic park operated by the Long Island State Park Commission, and is the principal facility maintained by it. It features miles of ocean bathing beaches with a typically vigorous surf, bay bathing beaches, bathhouses, swimming pools, diverse recreational activities, restaurants, an outdoor theater, a boardwalk, natural plantings and wildlife, and a substantial network of access highways, connecting roads and walkways. In all, it is a large carefully controlled complex devoted to the leisure time activity of great masses of people, particularly during the summertime.
Technically, the beaches involved in the dispute are four controlled by the Long Island State Park Commission, namely Jones Beach, Robert Moses State Park on Fire Island, Heckscher State Park, and Sunken Meadow State Park. The latter two have no ocean surf. However, the principal thrust of the action is the dominant Jones Beach complex, which for equivalency and adjacency could also include the Moses Park. Accordingly, for ease of expression, this opinion will be couched in the realistic terms of “ Jones Beach ”, but applies to all four.
Among the numerous people employed at Jones Beach are lifeguards. These lifeguards work not only at the swimming pools and bay beaches, which are relatively tranquil, but also on the vast ocean beaches which require trained and conditioned lifeguards knowledgeable in ocean rescue work.
The lifeguards do not work at the beach throughout the year. They work only during the bathing season without any continuing year-to-year contract. Lifeguards who are employed during one season begin their employment at the beginning of the season and end it with the conclusion of that bathing season. In the following year, the previous lifeguards have, by custom, a prior call on renewed employment, but they have no guaranteed *1073 re-employment rights, nor do they themselves agree to come back.
Apparently, the overwhelming proportion of men who were lifeguards during the 1970 season are members of Local 381, Building Service Employees International Union, AFL-CIO (called “ Union ”) of which Lawrence J. Byrne is President.
Throughout this opinion, for convenience, the parties opposed to the Union and its members shall be called in aggregate the “ State ”, and they include New York State, the Long Island State Park Commission and its Police Chief. Since 1963 the State has dealt with the Union as the lifeguards ’ representative. While there has been no Public Employment Relations Board certification of the Union, the State has in each of these years not only negotiated with the Union, but has also conducted a checkoff1 of dues of the lifeguards on behalf of the Union. No other union represents lifeguards at Jones Beach. This Union also currently represents other types of employees now working at Jones Beach.
Prior to the 1971 bathing season, the State indicated that it would rehire former lifeguards, but at lesser rates of pay than during 1970. The Union and individual former lifeguards took exception to the State position and a controversy ensued, which is still going on. The past lifeguards, through their Union representation, have refused to apply for renewed employment this year unless the offered wages were brought to a satisfactory level. The State, in turn, has refused to meet the wage demand and instead has hired a certain number of new non-Union lifeguards for pool and bay area supervision. The State was not able to procure ocean beach lifeguards at the time this matter was argued in court. So far in the 1971 season, the ocean beaches' are open, but only for limited bathing activity. Some ocean beach patrol is carried on by the regular police at the park.
The Union and the lifeguards have determined to picket at Jones Beach. They wish to have lifeguards walk up and down at key places, to carry placards, distribute leaflets, and to disseminate information, all in a peaceful manner. Presently, a number of lifeguards are at the beach scene in a non-working capacity, expressing their dissatisfaction, and incidents of friction have occurred.
Citing park regulations which prohibit advertising and demonstrations without a permit, the State, via the Park Commission, has refused to permit the picketing activity. The Union then commenced suit against the Long Island State Park Commission and its police commission seeking a permanent injunction against interfering with their peaceful picketing. Their *1074 motion before this court now, which the State opposes, is for a preliminary injunction prohibiting the State from interfering with peaceful picketing pending determination of the permanent injunction action.
On the other hand, New York State has in turn sued for a permanent injunction restraining the officers and members of the Union from interfering with other employees at Jones Beach, from taking action which would cause other employees to decline or discontinue work, from intimidating people making deliveries at the beach, from interfering with patrons of the State facilities, and from picketing or congregating at any point on or in proximity to the beach, and for an order directing the Union to instruct its members not to engage in any strike, work stoppage or slowdown. Pending determination of the permanent injunction action, New York State has moved here for a preliminary injunction prohibiting the Union and its members from engaging in any of the conduct sought to be permanently enjoined.
The two motions for preliminary injunction were heard and will be considered here together. To insure compliance with section 807 of the Labor Law, to the extent applicable, the court conducted a hearing, at which testimony was taken.
II. THRUST OF THE LABOR LAWS
A. Is the Trouble Labor?
An intriguing aspect of these motions is in the earnest desire of both parties in their oral arguments to avoid characterizing their controversy as any kind of labor dispute.
• On the one hand, the Union would have the court simply treat the former lifeguards as a group of ordinary citizens exercising their rights of free speech at Jones Beach. The State, on the other hand, wall not characterize this as labor trouble and sees the lifeguards as disorderly persons carrying on at the park without a permit.
It would appear to any objective observer that labor trouble in the generally understood sense is going on at Jones Beach. It is certain that the Union lifeguards are not working. The newspapers feature extended accounts of the absence of working ocean lifeguards at Jones Beach. Both sides to the controversy are issuing numerous statements sounding laborious. Government officials are reported as interesting themselves in the negotiations and in the possibilities of settlement. Most important, people are being limited in their use of the beaches, since *1075 ocean-certified lifeguards are not working because of their claim that the State will not pay them enough.
Yet, the parties stand aloof from labor characterization, possibly because of fears as to “ Taylor Law ” complications. Let us then examine this relatively new feature of the Civil Service Law, designed to solve strikes by vital municipal employees. It certainly occupies much current public attention in other areas. Does it apply here?
If the Taylor Law is applicable, perhaps the Union is concerned lest it be deemed conducting an unlawful strike. If the Taylor Law is applicable, perhaps the State is concerned of implicit recognition and bargaining obligations.
However, the motivations of the litigants pale before the factual realities. This court is bound to decide the controversy which exists and to seek the true essence of the disputation before it. Stated more simply, the court should operate in relation to what the parties are doing, not what they are saying.
This being so, the court did consider two possible areas of statutory law and their relevance to this case. One is the so-called Taylor Law (Civil Service Law, art. 14, §§ 200-212), dealing with public employees and public employee organizations. The other area is article 22-A of the Labor Law which deals with labor injunctions generally.
B. The Taylor Law
Under the predecessor statute to the Taylor Law, article 22-A of the Labor Law was considered inapplicable to labor disputes involving public employees, because the State has enacted other statutory provision for such disputes. (County of Westchester v. Arfmann, 53 Misc 2d 642 ; Manhattan & Bronx Surface Tr. Operating Auth. v. Quill, 48 Misc 2d 1021 ; Petrucci v. Hogan, 5 Misc 2d 480 ; and New York City Tr. Auth. v. Loos, 2 Misc 2d 733, affd. 3 A D 2d 740.) It would follow that if the Taylor Law applies, then article 22-A of the Labor Law will not apply. However, in the opinion of the court, the Taylor Law does not apply to the instant controversy.
1. The Lifeguards
The Taylor Law in plain terms cannot apply to the former lifeguards themselves.
This is because section 201 (subd. 8) of the Civil Service Law defines a “ public employee ” to mean a person holding a position with a governmental unit. But, the former lifeguards involved do not hold positions. They are people who have. *1076 worked for the government in the past, who do not now work for the government, and who decline to work for the government unless better wages are offered. They are not people who have walked off their jobs. They are people whose jobs have expired and who decline to reapply for employment this year unless they are satisfied.
Arguably, this represents a defect in the Taylor Law, since lifeguards perform vital public service and when they work they are public employees. However, they are past or future employees by virtue of seasonal or temporary employment and the Legislature could well have intended their exclusion from the limiting effect of the Taylor Law. Since the law is a drastic curtailment of a labor right, there are grounds to consider that only firm employees in demonstrable public positions should be covered. The Taylor Law is highly specific and the failure to refer to former or prospective employees of seasonal or temporary status must be accorded significance. It would be improper for the court to trespass on the legislative wisdom in this respect.
2. The Union
On the other hand, the Union, which right now represents existing public employees, could be an “employee organization ” under the Taylor Law (Civil Service Law, § 201, subd. 6) as an: “ organization of any kind having as its primary purpose the improvement of terms and conditions of employment of public employees ”.
Not only could the Union qualify under that definition by virtue of its representation of other present employees at Jones Beach, but the statutory definition is so loose that it also could apply to an organization which does not represent present employees.
But, this classification of the Union as an “ employee organization ” under the Taylor Law does not affect the motions at hand, since there is no “ strike ” of “ public employees ’ ’ going on or threatened, as that term is defined under the Taylor Law. Here the question of strict legal terminology is particularly important since a “ strike ” for one purpose may not be a “ strike ” for another. Under subdivision 10 of section 201 of the Taylor Law, the term “ strike ” means any strike or other concerted stoppage of work or slowdown by public employees ”. Since the former lifeguards are not now employees and since they are not stopping or slowing down work which they had not embarked upon in the first place, there is no strike within the meaning of the Taylor Law. While they may be “ striking ” in a general *1077 sense, as the word is normally understood by laymen, they are not conducting a “ strike ” as that term is narrowly defined in the Taylor Law.
Because the lifeguards are not ‘ ‘ public employees ’ ’ and because they are not 1 ‘ striking ’ ’ within the Taylor Law, the Union cannot here be involved in an improper employee organization practice under section 209-a of the Civil Service Law nor encouraging a prohibited strike under section 210 of the Civil Service Law.
While the State in an oral argument vigorously denied Taylor Law applicability here, with which the court concurs, it seeks in its papers Taylor Law type relief against the Union to prohibit its participation in 1 ‘ any strike, concerted work stoppage or concerted slowdown ”. For the reasons indicated, this request for relief will be denied.
C. Labor Law, article 22-A
Article 22-A of the Labor Law would apply to the instant dispute unless precluded by some other specific statute.
No such preclusion exists by virtue of the Taylor Law since it is not applicable to the dispute at hand. Nor is section 715 of the Labor Law limiting as the State asserts. That provision is part of article 20 and provides: 11 this article shall not apply to * * * (2) employees of the state or of any political or civil subdivision or other agency thereof ’ ’. Section 807 is part of article 22-A (not art. 20) and is, therefore, not affected by the provisions of section 715. Moreover, former lifeguards are not now employees anyway.
The circumstance here falls under the characterization of a “ labor dispute ”, which section 807 (subd. 10, par. [c]) of the Labor Law defines in material part as: “ any controversy concerning terms or conditions of employment * * * or seeking to arrange terms or conditions of employment * * * or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee'rr (emphasis supplied).
Accordingly, no present employment relationship need exist. The cases cited by the State, that section 807 is inapplicable here, are distinguishable. Both Arnold Bakers v. Strauss (1 A D 2d 604) and People v. Masiello (177 Misc. 608, affd. 271 App. Div. 875) involved disputes between delivering drivers and independent firms to whom they delivered, and not parties who could conceivably stand in the relation of employer and employee at any time. Moreover, the statutory wording is explicit.
*1078 Article 22-A of the Labor Law is captioned ‘ ‘ Injunctions in Labor Disputes Basically, that article provides that no injunction, permanent or temporary, may be issued in a labor dispute except after a hearing in compliance with the terms of the Labor Law. At the hearing the court took testimony and acquired the facts necessary to issue this decision. Among other things, it became clear that there was a labor dispute at Jones Beach, that considerable bitterness and acrimony surround it, and that while the picketing activity of the Union and the lifeguards has been largely peaceful, there have been incidents unduly offensive to the public safety.
Section 807 (subd. 1, par. [f]) requires in material part: “ [t]hat no item of relief granted prohibits directly or indirectly any person or persons from doing, whether singly or in concert, any of the following acts * * * (5) Diving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, picketing, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace * * * (7) Assembling peacably to do or to organize to do any of the acts heretofore specified ’ ’.
Moreover, article 22-A requires, for an injunction to be issued, that unlawful acts must be threatened, that substantial and irreparable injury to the complainant’s property will follow, that the harm of denying the relief will exceed the gain from the granting, that there is no adequate remedy at law and that public officers have been unable to furnish adequate protection.
From section 807 we must conclude that it is possible for the State to enjoin the Union from unlawful acts, but that the injunctive relief could not restrain the Union under section 807 (subd. 1, par. [f], els. [5], [7]) from assembling, picketing and disseminating information in a peaceful manner. This is so unless there is something special about Jones Beach which removes it from the scope of the Labor Law or other governing legal principle. Accordingly, we now turn to the nature of Jones Beach.
III. THE ENVIRONMENT VERSUS CIVIL LIBERTIES
The State argues that Jones Beach is a very special place, as indeed it is.
It relies upon a 30-year-old District Court decision in Nassau County (People v. Richards, 177 Misc. 912) which involved a criminal information stemming out of secondary picketing activity at the beach.
*1079 The State’s witnesses in fact testified that their policy guidance is based on former Commissioner Robert Moses ’ extended testimony in that case. The reported decision quotes Commissioner Moses that: “ ‘ the State policy was for the provision of space for outdoor recreation in the open country, which could not be provided in the crowded cities — on the assumption that people had to get away from cities to repair some of the damage and shock to their nerves caused by city life * * *
“ [T]here is a direct relationship between the maintenance of State parks and public health, particularly in the large metropolitan areas ’ ”. (People v. Richards, supra, at p. 914.)
He said: “ ‘ if we did not have an ordinance, people could not enjoy the quiet, rest and recreation for which the parks are designed. The noise interferes with people — advertising from the water — from the land — from the air — all of which have been attempted from time to time by minorities who don’t respect the rights of the majority of the people who come for recreation and for the benefit of which majority these ordinances were made ’ ”. (People v. Richards, supra, at p. 915.)
He added that if unrestricted advertising and parading were permitted in the parks: ‘“we could not control the parks; we could not control the people and the purpose for which the parks were created would be defeated ’ ”. (People v. Richards, supra, at p. 915.)
The court in the Richards case went on to discuss the Commissioner’s testimony as stating that anything that is commercial, noisy or obtrusive which interferes with the quiet and comfort of people who have come out of the city to escape the noise is properly excludable.
Interestingly enough, the court concluded its characterization of the Commissioner’s testimony by saying: “ he could not conceive of a situation where the Commission would tolerate conditions which might be the basis for labor troubles; that he could not conceive of any reason for picketing at Jones Beach because he could not conceive of any local dispute which would not be settled by the State authorities ”. (People v. Richards, supra, at p. 915.)
We have poised before us the clash of competing social principle. On the one hand, there is the desire, indeed the necessity, of people to seek leisure and quiet in a natural environment free from the pressures of everyday living. What was true 30 years ago of the need for the individual to seek sustenance in natural setting is even more applicable today. The multiplication of society has yielded a product of environmental distress which is one of today’s major social problems. Indeed the Jones Beach *1080 of 1941 was itself a relatively lightly used facility compared with the Jones Beach of 1971, and more people come there than from “ the city ”.
On the other hand, there is the competing drive for civil liberties and for appropriate expression in labor matters. The past 30 years have also seen marked development in the social conception of the rights of man. It is diminished solace for man to have comfortable physical surroundings if the conditions of his life in that environment are not tolerable.
And so, we have our conflict at Jones Beach.
A. Park Ordinances
The State has at least two ordinances at Jones Beach which it considers applicable. Both require permits. However, the Union has not requested permits and the testimony of the State officials at the hearing was clear that the unyielding policy of the commission would be to deny the permits. Accordingly, the court will put aside those provisions of law which might first require a plaintiff such as the Union here to exhaust formally his administrative remedies. To enforce such an insistence would be to ignore reality and prolong these proceedings without benefit. The law does not require exercises in administrative futility, for it is clear that a formal permit application will be denied. (See Matter of Borders v. Nassau County Dept. of Social Servs., 34 A D 2d 805 ; Lesron Junior v. Feinberg, 13 A D 2d 90.)
1. Advertising
The regulations adopted pursuant to section 777 (subd. 1) of the Conservation Law, as set forth in title 6 of the New York Official Compilation of Codes, Rules and Regulations, provide: “241.1. Advertising prohibited, (a) No person shall post, paint, affix, distribute, hand out, deliver, place, cast or leave about, any bill, billboard, placard, ticket, handbill, circular or advertisement; display any flag, banner, transparency, target, sign, placard or any other matter for advertising purposes; * * * or cause any noise to be made, for advertising purposes, or for the purpose of attracting attention to any exhibition, performance show or other purpose ’ \
The advertising ordinance is inapplicable to the lifeguard dispute since the ordinance manifestly refers to commercial advertising. It has to do with products and performances and not to labor activity or to a group seeking to enforce rights. In any event, the ordinance would be subject to the same principles described below in connection with the pertinent ordinance.
*1081 2. Meetings
6 NYCRR 242.8 captioned “ Meetings, exhibitions, parades, racing, etc.”, however, is pertinent. This states: “ (a) No person shall erect any structures, stand or platform, hold any meeting, perform any ceremony, make a speech, address or harangue; exhibit or distribute any sign, placard, notice, declaration or appeal of any kind or description * * * in any park except by permit ”.
It was the undisputed testimony that no permit has ever been granted by the State at Jones Beach for demonstrating, picketing, or distribution of leaflets. Indeed the only permit under this ordinance has been for Easter sunrise services conducted before the beginning of the usual beach “ season ”. The threat of enforcement of those regulations and the accompanying arrest of violators have prevented the Union from proceeding with its plans.
B. Validity of the Regulation
Both the Federal Constitution, in the First Amendment, and the State Constitution (in art. I, §§ 8, 9) guarantee freedom of speech and freedom to assemble and petition peaceably. Nevertheless, those rights are not unlimited. (United Public Workers of Amer. [CIO] v. Mitchell, 330 U. S. 75. See People v. Feiner, 300 N. Y. 391, affd. 340 U. S. 315 ; People ex rel. Doyle v. Atwell, 232 N. Y. 96.) Indeed, the courts may enjoin exercises of freedom of speech which involve force or violence and which give rise to a probability that the disruption will get out of hand. (Haber & Fink v. “ Jones ”, 277 App. Div. 176.) The right of assembly is restricted to peaceable assembly. (See Adler v. Board of Educ., 342 U. S. 485.) The right to demonstrate is not strictly the same as the right of free speech, since demonstration may have the element of overt disruptive conduct. (Cox v. Louisiana, 379 U. S. 536.)
In appropriate instances, freedom of speech and assembly may be limited by municipal regulations intended to protect the public health and welfare. (People v. Nahman, 298 N. Y. 95 ; People ex rel. Doyle v. Atwell, 232 N. Y. 96, supra. See Hague v. C.I.O., 307 U. S. 496 ; Davis v. Massachusetts, 167 U. S. 43.) In Cox v. New Hampshire (312 U. S. 569, 574) it was said: “ Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public [property] has never been regarded as inconsistent with *1082 civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend * * * the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places ”.
Put more succinctly, in determining whether a public place may be placed off limits to pickets and demonstrators, the court must consider the character of the place being sought for use as a public forum, the usual activities conducted there, the nature of its essential purposes, whether a relevant audience is to be found, and whether substantial inconvenience may result from the use or abuse of .that forum. (See Wolin v. Port of New York Auth., 392 F. 2d 83, cert. den. 393 U. S. 940.)
C. The Balance of Social Utility
The Union’s approach to the problem is oversimplified, but not wholly inaccurate. While it seeks to characterize itself as a group of citizens exercising constitutional rights, the people are more than that. They are the former lifeguards and their representatives and they will not work at Jones Beach unless they get more pay and they want the public to have that message. Regardless of the consequences which may attach to recognition of their true status, their real involvement is not for civil liberties in general principle, nor for political or civil libertarian causes. They are picketing the place at which they have worked, and will likely work again, against the authorities for whom they have worked, and will likely work again, for more money. The place at which they are conducting their demonstrative activities has been the place of their employment. That segment of the public who attends the beach is that segment of the public who would be most interested in the withholding of their services.
There is good reason for the park ordinances cited. In appropriate cases, their enforcement is essential. The beach would poorly serve its purpose if hubbub were to prevail. However, the ordinances cannot be designed to make Jones Beach entirely immune from labor protests of its own people. If employees, albeit seasonal, are deprived of the right to demonstrate reasonably at the beach itself, there is lost to them one of the important rights of labor. The United States Supreme Court has held that picketing, where not unduly disruptive, is an inherent labor right. (Food Employees v. Logan Plaza, 391 U. S. 308, 313 ; Thornhill v. Alabama, 310 U. S. 88, 102-104.)
*1083 1. The Public’s Interest Does Not Bequire Total Preclusion of Picketing
In balancing the social utilities, we must consider that if the lifeguards cannot reasonably picket at Jones Beach, they cannot effectively picket at all. While the public is entitled to privacy and peace at the beach, that is the beach at which the lifeguards are to work. The public too is not wrapped in bunting, a trip to the beach does not close modern comprehension. The transporting automobiles have radios and the beaches are dotted with transistor radios bringing the news in with the sounds of today. The absence of the ocean lifeguards and limited bathing procedures forced by it are heavily suggestive of the world’s realities.
A reasonable and peaceful pattern of picketing need not be so offensive and disruptive as to warrant depriving the lifeguards of fundamental personal rights. Jones Beach fairly teems with people and activity during the summer, and it is arbitrary to consider that a peaceful picketing pattern, within proper limits, is by itself fatally burdensome.
The end result of the State’s reasoning is there can be no picketing or demonstrative labor activity whatsoever at Jones Beach at any time. This total preclusion is unacceptable. A marginal public advantage in park usage cannot work a forfeiture of the constitutional provisions allowing free speech and free peaceable assemblage and more directly the inherent rights of labor to picket. (Kraus & Bros. v. Bergman, 2 N Y 2d 155 ; J. H. & S. Theatres v. Fay, 260 N. Y. 315 ; Mount Sinai Hosp. v. Davis, 18 Misc 2d 311.)
2. J ones Beach is a Public Place
There is no doubt that Jones Beach is a public place. The internal structure of the Jones Beach park island has heavily traveled roads, sidewalks and parking lots, in addition to the outright recreational facilities. There is no ground for excluding pickets from property because its technical ownership resides in the State or even in private hands. It is the public use of the property which controls. (See Matter of Madole v. Barnes, 20 N Y 2d 169.)
3. Latitude of the Sides
It would be unreasonable and opposed to democratic American tradition to permit the State to foreclose labor protests entirely at Jones Beach by its lifeguards who have legitimate interests in making such protests. Moreover, section 807 (subd. *1084 1, par. [f], els. [5], [7]) of the Labor Law would expressly prohibit a court from giving injunctive relief with respect to picketing and communicating information and assembling peaceably to such ends. Even the Taylor Law, if applicable, does not prohibit by its terms peaceful picketing, patrol and dissemination of information.
On the other hand, because the Union has the right to conduct certain picket activity, it does not mean that its rights are unlimited. The court is satisfied from the testimony that there have been acts by Union members which have been prejudicial to the public safety. These include the interference with rescues and encouragement of disorder in the surf. Danger to the public cannot be tolerated under any circumstances. There have also been complaints of vandalism and damage to property by Union members, although the proof has not supported more than an isolated incident or two. There has clearly been strong language exchanged, but this cannot be entirely excluded by judicial edict. The situation is such that tempers and passions are high. But, a certain amount of give and take, although it may be rough in tone, is inevitable and is the price of free speech. Should there emerge a provable pattern of unlawful vandalism or should oral address become too abusive, the court’s view and action may be changed accordingly.
IV. DIRECTIONS
The court will resolve this conflict by granting the relief sought to the following extent:
1. Union members and officials shall be entitled to assemble and picket peaceably at locations at the side of access roads to Jones Beach and other Long Island State Park Commission facilities, and including the toll booths to Jones Beach on the causeways, and at the entrances to each of the Jones Beach bathhouses and bay areas as well as the entrances to other facilities.
2. The number of pickets shall not exceed six at any one picketing location.
3. There shall be no obstruction by design or placement of pickets of any of the entrances or exits, nor any interference in any way, directly or indirectly, with the free coming and going, at all points, of all persons using the beach ór other commission facilities or lawfully present at those places for any reason.
4. There shall be no placards exceeding three feet by four feet in size carried by pickets at any of the permitted picketing positions. There shall be no permanent signs of any kind attached *1085 to fixed locations. The only signs permitted are those to be carried.
5. Information may be disseminated orally, but no artificial sound amplification shall be used on State property.
6. The court is concerned about the distribution of leaflets because of their litter potential, and under the circumstances will prohibit them.
7. No Union member shall threaten or harass any employee of the State or interfere with the performance of any such person’s -duties, or with any deliveries.
8. The Union and its members are expressly enjoined from in any way interfering with the conduct of swimming and bathing operations on the ocean beaches, in the bay areas, and in the pools. They shall not, by any procedure, ruse, device or act, interfere with lifeguards or other officials in the course of their duty, interfere with rescues, encourage swimmers to do or refrain from doing any conduct, or in any way whatsoever insert themselves into the actual swimming and bathing processes. They shall refrain from simulating false emergency situations and shall do nothing which in any way detracts from the public safety of swimmers and bathers.
Both motions are, except to the extent granted above, in all other respects denied.
The Union shall post a bond of $1,000 to provide an undertaking as security for damages which may be sustained by the injunctive relief being awarded. The State shall not be required to provide an undertaking, but may be liable for damages not to exceed a like amount in the event a trial of the actions for a permanent injunction results in a determination that the relief is not warranted. (CPLR 2512 ; City of Yonkers v. Federal Sugar Refining Co., 221 N. Y. 206 ; City of White Plains v. Griffen, 169 Misc. 706, affd. 255 App. Div. 1003.)
Short-form order signed, embodying procedural directions set forth in section 807 of the Labor Law.